**HOUSTON CHRONICLE PUBLISHING COMPANY, Appellant,**

v.

**McNAIR TRUCKLEASE, INC., et al., Appellees.**

**No. 16414.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Jan. 30, 1975.

Rehearing Denied March 6, 1975.

Liddell, Sapp, Zivley & Brown, W. Robert Brown, Charles H. Waters, Jr., Houston, for appellant.

Fulbright & Crooker, M. W. Parse, Jr., Barry N. Beck, Houston, for appellees.

PEDEN, Justice.

McNair Trucklease, Inc., and its wholly-owned subsidiary, Greater Houston Cartage Company, sued the Houston Chronicle for breach of a contract. The case was tried to the court without a jury, and McNair recovered a judgment in the amount of $231,756.98 plus prejudgment interest in the sum of $14,922.89.

In October, 1965, the Chronicle and McNair (at that time known as Prudential Leasing Corporation) entered into a five year contract for McNair to haul the Chronicle's newspapers to distribution points inside the City of Houston. Performance commenced on January 1, 1966. With the full knowledge and consent of the Chronicle, Prudential created Greater Houston Cartage Company, a wholly-owned subsidiary, to perform the contract, under which Greater Houston provided both trucks and drivers. The trial judge found that the contract was amended at least three times, with respect to rate of compensation and liquidated damages, by letter agreements.

On November 1, 1968, Greater Houston and the Chronicle executed a contract for Greater Houston to haul the Chronicle's papers to points within the State of Texas but outside of Houston. New trucks were to be purchased to fulfill this "state contract," and in the negotiations between Greater Houston-McNair and the Chronicle it was contemplated that a new fleet of diesel trucks would be obtained for the city contract. During the latter part of 1969 and early 1970 negotiations were begun between the Chronicle and Mr. Robt. C. McNair to extend the term of the city contract that was to expire at the end of 1970. These negotiations culminated in a letter agreement dated April 10, 1970 signed by Mr. McNair for Greater Houston and by Mr. Everett E. Bouldin for the Chronicle. Mr. McNair's letter read as follows:

"I am writing you to confirm our agreement relative to the equipment and services which we have contracted to provide you and the compensation which you have agreed to pay us for these services.

"Our new contract will be dated January 1, 1970 and will expire December 31, 1974. We agree to furnish 18 trucks and 10 drivers, 7 days per week; 4 extra trucks and drivers per week to be used Wednesday, Saturday, and Sunday or at the Chronicle's discretion; 12 trucks and 12 drivers, 3½ hours per day for pre-shipments on Wednesday morning, truck shuttle on Friday nights for a total consideration of $22,360.38 per month.

"For extra trucks over and above the contract, the rate for 1 truck and 1 man will be $7.50 per hour, the rate for one truck and 2 drivers will be $10.00 per hour. Extra drivers will be $2.50 per hour. Extra trucks will be $5.00 per hour. The monthly rate for an additional truck and driver will be $1320.00 per month. The monthly rate for an additional truck and driver on a permanent basis will be $1200.00 per month.

"We also agree that should we fail to provide 18 drivers and 18 trucks for any day that $35.50 per man and truck per day will be deducted from our compensation. I do not wish to have this item incorporated in the contract, as it possibly

could jeopardize our financing arrangements on our new equipment. I would be agreeable to covering this in a separate letter if this meets with your approval.

"I have not reviewed our existing contract to see if any other changes should be made; however, I have no particular suggestion in mind and would assume that Willis Witt will draw a new contract that will be basically the same as our present contract with the exception of the change in services and our compensation.

"If this letter represents your understanding of our agreement, please sign at the understated place and return 2 copies, retaining 2 for your file."

While no new formal contract was subsequently entered into, the parties performed under the letter agreement of April 10, 1970. The Chronicle paid for services according to the rates set forth in the letter, and a rate increase was requested by McNair and approved by the Chronicle.

Greater Houston assigned its contract rights to McNair Trucklease, Inc.

On May 25, 1971, Greater Houston's drivers went on strike. Mr. Robert McNair, president of Greater Houston, told the Chronicle that McNair could supply substitute drivers, but the Chronicle told him not to furnish trucks or drivers until further notice. An agreement was reached on or about June 7, 1971 between McNair and the Chronicle whereby NcNair would provide 19 trucks without drivers under the city contract for the balance of the term of the contract at a cost of $444.50 per vehicle per month plus 11¢ per mile. Trucks were furnished under this arrangement until August 1, 1971, when the Chronicle informed McNair that its trucks were no longer to be used in the distribution of the Chronicle in Houston.

McNair sued the Chronicle for breach of contract and obtained a judgment. Both parties have appealed.

*Appeal by the Houston Chronicle*

The Chronicle's first point of error complains that the trial court's conclusion of law determining the existence and nature of the contract is erroneous as a matter of law. The point of error refers to the trial court's first, ninth and thirteenth conclusions of law, which were:

1.

"As of August 1, 1971, the City Contract consisted of the original agreement (Plf. Ex. 2) as modified or amended by (a) the agreement dated April 10, 1970 (Plf. Ex. 12), (b) the oral agreement adding a truck and driver made in October, 1970, (c) the agreement increasing the rates effective January 1, 1971 and (d) by the oral modification or amendment made on or about June 7, 1971, eliminating drivers and providing for the furnishing of vehicles alone at the initial rate of $444.50 per month per vehicle plus 11¢ per mile.

9.

"Since (a) Greater Houston was at all times a wholly-owned subsidiary of McNair formed with the knowledge and acquiescence of the Chronicle for the purpose of performing the City Contract, (b) the Chronicle knew that both Prudential-McNair and Greater Houston would be engaged in performing the same, (c) McNair remained obligated on the City Contract after the assignment to Greater Houston, and (d) the City Contract as theretofore or thereafter amended was assigned as security to McNair on or about June 16, 1970, either McNair or Greater Houston or both may enforce the same as amended.

13.

"The letter agreement dated April 10, 1970 (Plf. Ex. 12) is an enforceable agreement without the execution of a more formal contract."

The Chronicle argues that the letter agreement of April 10 shows that the parties contemplated the execution of a formal contract and did not regard the letter as a contract. The test is whether the parties intended to be bound by the letter agreement. The existence or lack thereof of this intention is a question of fact, not of law. Scott v. Ingle Bros. Pacific, Inc., 489 S.W.2d 554 (Tex.1972); Simmons & Simmons Construction Co. v. Rea, 155 Tex. 353, 286 S.W.2d 415 (1956).

"We are familiar with a rule where the parties agree that a contract entered into by them orally shall be embodied in a formal writing and signed by them before a binding agreement is consummated that there is no binding contract until that has been done, but if they intend their agreement shall be effective from the time when it is made, it will be given effect from that time though they agree or intend that a formal writing embodying its provisions shall subsequently be prepared and signed." Vick v. Mc-Pherson, 360 S.W.2d 866, 868 (Tex.Civ. App.1962, writ ref. n. r. e.).

The parties negotiated the terms of the original 1965 contract, and formally executed it. Included within this agreement was that Greater Houston would be an independent contractor, the extent of insurance coverage required to be carried by Greater Houston, the assignability of the proposed contract, and whether or not Greater Houston would be excused for non-performance due to a strike. The final paragraph of the letter agreement of April 10 indicates that except for the terms changed by the letter, the parties expected the remaining provisions of the contract would remain the same. Mr. McNair testified, concerning the negotiations leading to the signing of the letter, that those items not covered in the letter would remain the same as the original contract executed in 1965.

Subsequent to the execution of the April 10 agreement the Chronicle used the trucks and drivers provided by Greater Houston at the rate of compensation set forth in the agreement. Also, in October, 1970, a truck and driver were permanently added to the contract at the cost specified in the April 10 agreement. Both parties continued to operate as they had under the 1965 agreement except for the change in compensation set out in the letter.

One of the terms included in the letter agreement was that the contract would run for a new five year period of January 1, 1970, to December 31, 1974.

The trial court made the following unchallenged findings of fact:

12) "In executing plaintiff's exhibit 12 [letter dated April 10, 1970], the parties thereto intended to amend the City contract by extending the term of same to and including December 31, 1974, by increasing the rate of compensation to be paid from and after January 1, 1970, and by changing to some extent the services to be performed.

15) "At least by June 17, 1970 and from and after that date, the parties intended to be bound by the terms of the letter agreement dated April 10, 1970, and intended the same to be effective without the execution of a more formal contract. All material elements had been agreed to and nothing of a material nature was left to be agreed upon.

22) "On or about June 7, 1971, Mc-Nair and the Chronicle made an oral agreement that under the City Contract as amended, the furnishing of drivers would be eliminated and 19 vehicles without drivers would be furnished for the balance of the term at an initial monthly rate per vehicle of $444.50, plus 11¢ per mile, the Chronicle to bear all insurance costs. The same agreement was made with respect to the State Contract which covered eight vehicles.

23) "In making the oral agreement set out in finding 22, the parties intended to

modify the City Contract as amended in the particulars set out in said finding."

We hold that these findings of fact support the conclusion of law that a contract did exist, as the trial court concluded, and we overrule the Chronicle's first point of error.

■ The Chronicle's second point of error is that the trial court applied an incorrect measure of damages by refusing to deduct from the contract price the cost of acquisition of the trucks required to perform the contract. The Chronicle says that McNair is entitled only to net profits for the remainder of the term of the contract. McNair contends that it is entitled to the contract price less the costs of performance saved as a result of the breach and that the question presented by the Chronicle's second point of error is whether or not the acquisition costs of the trucks that serviced the Chronicle were costs of performance.

"In awarding compensatory damages, the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harm that he had no sufficient reason to foresee when he made the contract." Restatement of Contracts, § 329, Comment a (1932).

Where the contract requires a substantial capital investment by one of the parties in order to perform, he reasonably expects to make a profit and recoup his capital investment. If the contract is breached the injured party not only loses his expected profit but also loses that part of his incurred capital expense which he is unable to recover. The injured party should recover the contract price less the expenses he saved by not performing. The capital expenditure for trucks is not a cost of performance for which the defendant is allowed a credit against the contract price. If McNair could not recoup its capital investment it would not be in as good a position as if the contract had been fully performed.

■ While the defendant is liable for the pecuniary loss of the plaintiff, the plaintiff must attempt to mitigate his damages. When a contract is breached those capital items for which an acquisition expense has been incurred may be idled. It is the duty of the injured party to show he attempted to find a new use for the capital items in order to minimize his pecuniary loss. But the burden of proof as to the extent to which the damages were or could have been mitigated lies with the party who has broken the contract. Polis v. Alford, 273 S.W.2d 79, 80 (Tex.Civ.App.1954, writ ref.). Upon a showing that the capital items were or could have been used in some other productive manner and the amount that this would have reduced the plaintiff's pecuniary loss, the defendant is allowed a reduction in the amount of damages for which he is liable.

In the present case McNair purchased twenty-six Mack Trucks, nineteen of which were necessary for the performance of the city contract. These trucks were purchased in reliance upon the contract with the Chronicle to deliver its papers in Houston. McNair obligated itself to pay $364,158.06 for the trucks; that this cost was paid over a period of five years did not alter the fact that McNair was liable for the full amount as of the date of purchase.

Mr. McNair also testified that the useful life of the trucks was five years and that they would be obsolete after five years.

Corbin states the measure of damages for the breach of a hauling contract to be:

"One who has contracted to transport goods for the defendant by motor truck over a period of time is entitled to damages for the defendant's failure to supply cargoes for the agreed number of trips, measured by the agreed price of those trips diminished by the cost saved to the

plaintiff by not having to make the trips." Corbin, Contracts § 1038 (1964).

The Restatement of Contracts declares at § 329 (1932) that:

"Where a right of action for breach exists, compensatory damages will be given for the net amount of the losses caused and gains prevented by the defendant's breach, in excess of the savings made possible, if established in accordance with the rules stated in §§ 330–346."

In discussing when damages may be measured by expenditures in part performance, the Restatement of Contracts, § 333 (1932) states:

"The amount of the plaintiff's expenditures, reasonably made in performance of the contract or in necessary preparation therefor, is included in compensatory damages, with the following limitations:

"(a) Such expenditures are not recoverable in excess of the full contract price promised by the defendant.

"(b) Expenditures in preparation are not recoverable unless they can fairly be regarded as part of the cost of performance in estimating profit and loss.

"(c) Instalments of the contract price already received and the value of materials on hand that would have been consumed in completion must be deducted.

"(d) If full performance would have resulted in a net loss to the plaintiff, the amount of this loss must be deducted, the burden of proof being on the defendant."

Section 329 allows net gains as a measure of damages. Comment a after Section 333 states:

". . . net gains prevented by the breach include the full value of the performance promised by the defendant, less the cost of completion by the plaintiff. This difference is not the same as the 'net profits' of full performance; for the latter are the full value of the performance promised by the defendant, less the cost of full performance by the plaintiff and not merely his cost of completion. The expenditure incurred by the plaintiff prior to breach is normally reimbursed to him, when the defendant gives the promised compensation. Such expenditure, therefore, is included in any judgment for the full contract price less cost of completion, except to the extent that full performance would have resulted in a net loss. In cases where full performance would have resulted in a profit, the full contract price equals the plaintiff's total expenditure plus the amount of the profit; and the full contract price less the cost of completion equals the plaintiff's expenditure in part performance plus the amount of the profit. A judgment for such expenditure, therefore, is a judgment for a portion of the value promised by the defendant, the receipt of which by the plaintiff is prevented by the breach."

We feel that this comment accurately delineates the rights and obligations of the parties under the facts in this case. McNair purchased the trucks, incurring the financial obligation in preparation of and expressly for performance of the contract. The breach by the Chronicle prevented McNair from recovering $187,463.20 of this expenditure of $364,158.86.

The 1933 pocket supplement to the Restatement on Contracts, prepared by Ira P. Hildebrand, former dean of the University of Texas Law School, states that Texas follows the rationale of this section as illustrated by Dunham v. Orange Lumber Co., 125 S.W. 89 (Tex.Civ.App.1910, no writ). In Dunham the plaintiff contracted with defendant to recover sunken logs. In preparation to perform the contract the plaintiff constructed at his own expense a raft with which to haul the sunken logs to the surface. The court's holding was:

"The jury was instructed that in arriving at the amount of profit plaintiff may have made, all the expenses of building the boat must be taken into consideration

along with other expenses of carrying out the contract, to be deducted from the amount to be realized for the work. This was error. This was not part of what would have been the expense of carrying out the contract and earning the price, which was saved to appellant by stopping the work, and which must be deducted from the price in estimating the profits. The expense with regard to the boat had been incurred by appellant to the extent, according to the petition, of $450, and it would rather seem that this should be added to, rather than subtracted from, the other damages." at p. 90.

The Chronicle's breach denied McNair its expected profit and the recapture of its incurred expenses, including the acquisition costs of the trucks.

██ McNair offered testimony that it attempted to mitigate its loss by leasing the trucks to Crenshaw Poultry and to Moncrief-Lenoir. The trial court found that McNair made a reasonable effort to lease the 19 vehicles in an effort to mitigate its damages, but that it lost money on both leases. The Chronicle made no request for additional findings of fact. Absent a trial court finding that McNair's damages were or reasonably should have been mitigated, we may not presume such finding. Texas Rules of Civil Procedure, Rule 299. The Chronicle's second point is overruled.

██ The Chronicle's third and last point of error is that the trial court erred in disregarding the corporate entities of Greater Houston Cartage Company and McNair Trucklease, Inc. and that this error led to prejudicial exclusion of relevant evidence concerning cost of acquisition of the trucks. The trial court was entitled to conclude from the evidence that the formation of Greater Houston was purely for the convenience of McNair, that the Chronicle was aware of the purpose for its formation and totally acquiesced in it and in the assignment of the contract to it. The Chronicle contends that McNair and Greater Houston should be considered as

separate entities and therefore defendant's exhibit 20, which the bookkeeping records reflect as McNair's charge to Greater Houston for truck rental, should have been admitted as evidence that the expense to Greater Houston to lease the trucks from McNair was $144,349.42 per year. This point of error is overruled for two reasons.

First, the trial judge was entitled to conclude from the testimony that the lease was not an arms' length transaction. Mr. McNair, president of both McNair Trucklease and Greater Houston, testified that he set the amount to be charged Greater Houston for the use of the trucks leased from the parent corporation, McNair, that he set this figure arbitrarily and that it was nothing more than an intercompany bookkeeping function. After the purchase of the trucks in question, McNair and its wholly-owned subsidiary, Greater Houston, always filed consolidated financial statements and consolidated tax returns. All funds received by Greater Houston from the Chronicle were deposited directly into the operating account of McNair.

There was ample evidence in this case to authorize the trial judge to disregard the separate corporate existence of the parent company and its wholly-owned subsidiary. It is interesting to note that in Williams v. Powell Electrical Mfg. Co., Inc., 508 S.W. 2d 665 (1974, no writ), the Fourteenth Court of Civil Appeals recently held that a covenant entered into by a parent company could be enforced by its wholly-owned subsidiary without an express assignment of the covenant; to require an assignment would be "a formalistic, empty act."

Second, the trial court found that "on June 16, 1970, Greater Houston assigned to McNair as security all contract rights under the City Contract as theretofore or thereafter amended and all other contract rights with the Chronicle thereafter acquired by it." The court also found that on or about June 7, 1971, McNair and the Chronicle made an agreement that only trucks would be supplied. The final amendment to the contract again made

McNair the primary party, and it was its actual cost of obtaining the trucks that should be considered, since any intercompany charge between Greater Houston and McNair was eliminated by this modification. These findings of fact were not challenged by the Chronicle. The trial court was entitled to conclude from the record that in their negotiations for the original contract and subsequent modifications the parties were not concerned with the separate corporate entities of McNair and Greater Houston. The trial court's Findings of Fact 16 and 22 support its Conclusion of Law 9, in which the court found McNair a party to the contract. This makes the actual acquisition cost to McNair relevant, not the intercompany record of the charge against Greater Houston.

### Appeal by McNair

The trial court found that the contract price for a typical month after August 1, 1971, would have been $12,072.86. For the remainder of the contract term following the breach this would amount to $494,987.-00. From that figure the court deducted certain items to arrive at the amount of the judgment, $231,756.98. McNair complains of these deductions (as to the third item, McNair complains only of the deduction of $20,425.09 for inflation):

| | |
|---|---|
| Overhead (general and administrative) expenses | $ 31,883.13 |
| Interest expense 8/1/71 to 12/31/74 | 22,730.94 |
| Costs of performance (includes $20,425.09 for inflation) | 129,665.98 |
| Salvage value of unsold trucks | 47,600.00 |
| Sales price of trucks sold to Crenshaw | 17,000.00 |
| These items were also deducted: | |
| Taxes and licenses | 11,068.53 |
| Washing | 2,747.82 |
| Miscellaneous | 533.62 |
| Total deducted | $263,230.02 |

In McNair's first point of error it complains of the trial court's having deducted from McNair's recovery the amount of its general and administrative (overhead) expenses allocated to the city contract, $31,883.13, despite the trial court's unchallenged finding that after August 1, 1971, such expenses were not reduced by the Chronicle's breach of contract.

5 Corbin on Contracts § 1038 (1964), states:

"The only saving that is to be deducted is the saving expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary . . .

"If the defendant's breach causes a reduction in the extent of business done by the injured party, but does not create any reasonable opportunity for the latter to reduce his general overhead expenditures, of course the defendant is entitled no reduction in the damages awarded against him with respect to overhead costs."

Having found (#48) that the Chronicle's breach of contract reduced McNair's business but not McNair's general overhead expenses, the trial court erred in excluding the $31,883.13 overhead item from McNair's damages. Our holding does not allow McNair a double recovery. It merely allows McNair to recoup this item of expense which the trial court found was not saved as a result of the breach.

Next, McNair complains of the deduction from the contract price of $22,730.94 for interest payments due on the installment contract to purchase the trucks. The trial court found that this expense was not saved by the breach of contract, but McNair derived a benefit by financing payment for the trucks over a period of time. McNair had use of the purchase money and was required to pay interest for this privilege, but the Chronicle should not be taxed with the cost of this benefit to McNair.

Another reason for allowing the Chronicle a credit is that failure to do so would result in a double recovery for McNair, because it has been awarded pre-judgment interest, part of which was earned on that portion of the acquisition cost of the vehicles that was to be recouped subsequent to the breach.

McNair's third point of error alleges that it was error for the trial court to assign an inflation factor to the cost of operation of the vehicles over the term of the

contract remaining after the breach occurred.

When breach of a contract occurs by anticipatory repudiation, "the courts do not treat the contract as though it contained a promise to render performance as of the date of the repudiation. Damages will be computed as of the date fixed for performance." 22 Am.Jur.2d 81, Damages § 52, citing Eugene B. Smith & Co. v. Russek, 212 F.2d 338 (Fifth C.C.A., 1954).

> "The fact that an anticipatory repudiation is a breach of contract . . . does not cause the repudiated promise to be treated as if it were a promise to render performance at the date of the repudiation. Repudiation does not accelerate the time fixed for performance; nor does it change the damages to be awarded as the equivalent of the promised performance. . . ." Restatement of Contracts § 338 (1932), Comment a.

In our case McNair's performance was to continue for more than three years after the breach, but when our case was tried the term of the contract had almost ended, and the trial court had no difficulty in determining the effects of inflation on McNair's operating costs during each year after breach of the contract. We overrule McNair's third point.

McNair's fourth point complains of the trial court's having reduced its recovery by $47,600, the value of seventeen of the trucks on December 31, 1974, the expiration date of the contract.

During the remaining term of the lease McNair sold two of the nine-ton trucks and retained possession of the other seventeen. The court found that the trucks had a salvage value of $2,800 each on that date and awarded a reduction of $47,000 from the contract price to the Chronicle. Had the contract been fully performed McNair would have had the full contract price and possession of the trucks. The Chronicle did not show that McNair's damages could have been miti-

gated by selling the trucks when the contract was breached for more than their value when its term ended. We sustain McNair's fourth point.

In an attempt to mitigate its damages McNair leased twelve trucks to Crenshaw Poultry Company. It was required that these trucks be converted from dry vans to refrigerated vans at an expense of $6500 per truck. Two of them were sold for $15,586.30 each. The trial court found a net gain to McNair of $17,000 on this sale and reduced the Chronicle's damages accordingly. The fact that the Crenshaw lease operated at a loss does not alter the fact that McNair received substantially more than the $5600 salvage value for the two trucks. The Chronicle was entitled to a credit because this sale mitigated damages. McNair has been awarded the contract price with no deduction for the acquisition cost of the trucks, and we have allowed no credit for their salvage value of $2800 each. The trial court did not allow McNair salvage value on these two trucks, so McNair benefited by only $11,400, not $17,000, and the proper credit to the Chronicle should have been $11,400. We partially sustain McNair's fifth point of error; we hold that McNair's recovery should have been reduced by $11,400 instead of $17,000, so it should now be increased by $5,600.

The final point of error presented by McNair is that it was entitled to prejudgment interest upon the entire judgment from the date of breach instead of prejudgment interest on a stairstep approach of six per cent per annum on $5,652.61 each month beginning September 1, 1971 to and including May 1, 1974, the end of the trial. The parties agree that the awarding of pre-judgment interest was proper. We find no error in the trial court's method of computing pre-judgment interest.

American National Ins. Co. v. Fox, 184 S.W.2d 937, 944 (Tex.Civ.App.1944, writ ref. w. o. m.), cited by McNair, does not deal with pre-judgment interest but with

whether the judgment should include future payments under the contract as well as those already matured. The Chronicle's position is supported by Pollack v. Pollack, 39 S.W.2d 853, 858 (Tex.Comm'n App. 1931, holding approved).

We have held that the trial court erred in reducing the judgment in three instances. As to two of them, the $47,600 salvage item and the $5,600 mitigation of damages adjustment, no pre-judgment interest should be added because these damages did not accrue until December 31, 1974.

The judgment of the trial court is affirmed in part and is modified to increase the recovery of McNair Trucklease, Inc., and Greater Houston Cartage Company by $85,083.13 plus pre-judgment interest on $31,883.13 of the increased amount. This cause is remanded to the trial court for entry of a judgment in accordance with this opinion.