JUENGEL CONSTRUCTION CO., INC.,
Plaintiff-Respondent,

v.

MT. ETNA, INC., a corporation, et al.,
Defendants-Appellants.

No. 42327.

Missouri Court of Appeals,
Eastern District,
Division 2.

July 28, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 21, 1981.

Application to Transfer Denied
Nov. 10, 1981.

Albert A. Michenfelder, Jr., David C. La-Pee, Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, for Mt. Etna, Inc. & Grasso Brothers, Inc.

Richard B. Dempsey, David L. Baylard, Shifrin, Treiman, Barken, Dempsey & Ulrich, Clayton, Robert J. Koster, King & Koster, St. Louis, for Nat'l Super-Mkts. & Hastings & Chivetta, Architects, Inc.

GUNN, Acting Presiding Judge.

Plaintiff-respondent Juengel Construction Co., Inc. (Juengel) brought suit against defendants-appellants, Mt. Etna, Inc., Grasso Brothers, Inc. (Grasso), National Supermarkets, Inc. (National) and Hastings & Chivetta Architects, Inc. (Hastings & Chivetta), arising out of the renovation and remodeling of a building for National. Count I was against Grasso and Mt. Etna and sought damages for lost profits for breach of a construction contract. Count II sought actual and punitive damages from National and Hastings & Chivetta for tortious interference of contract. A third count alleging defamation was dismissed by Juengel before trial.

In a jury waived case judgment was for Juengel against Mt. Etna and Grasso on Count I for $44,770.78 for lost profits by reason of breach of contract. Judgment was against Hastings & Chivetta on Count II for $1.00 actual and $10,000 punitive damages for tortious interference of contract.

On appeal Grasso and Mt. Etna raise the following points: (1) the contract was unenforceable for failure of performance of conditions precedent; (2) Juengel failed to prove the amount of lost profits with sufficient certainty. Additionally, National and Hastings & Chivetta allege that proof is lacking for tortious interference of con-

tract; that even if there were such interference, it was justified.

We affirm the judgment.

The Grasso brothers are the sole stockholders of Mt. Etna, Inc., which in turn owns Grasso Plaza, a shopping center in St. Louis County. National Supermarkets, Inc. is the principal tenant at Grasso Plaza. In late 1975 the Grassos contemplated remodeling a portion of Grasso Plaza, and notified Juengel Construction Company, Inc., which had previously performed various construction jobs for them, of their expectations.

In February, 1976, Mt. Etna, as lessor, and National, as lessee, executed a lease which provided for remodeling and expansion of the National store at Grasso Plaza. The parties agreed that Mt. Etna would pay $400,000 of the construction costs and National would pay the excess; the amount of Mt. Etna's obligation was later increased to $500,000.

The complicated series of interactions between the parties effectively commenced with a meeting in March, 1976 at the Grasso Plaza jobsite for a discussion of the construction project. Attending were representatives of Juengel, Mt. Etna, National and Hastings & Chivetta, the architects retained by National.

On May 3, 1976, Juengel and Mt. Etna executed the agreement written by Juengel that is the subject of this lawsuit. The instrument, entitled "Construction Contract and Agreement between Owner and General Contractor," names Juengel as the general contractor and delineates its duties regarding the Grasso Plaza project. The contract provides that Juengel perform according to the specifications of Hastings & Chivetta Architects, with Mt. Etna and National being entitled to name the subcontractors and suppliers to submit bids for the project. The contract further provides that "[t]he General Contractor, Owner and National Supermarkets will jointly decide which of the sub bidders will be awarded a contract on their phase of the work."

Subsequently, in a letter dated June 17, 1976, addressed to Mt. Etna, a National representative set out terms of agreement between National and Mt. Etna on the Grasso Plaza project. National substantially duplicated portions of the Juengel-Mt. Etna contract, providing that the "Lessor and the Lessee . . . shall jointly name the subcontractors and suppliers to submit prices" for the project and that "[t]he General contractor [Juengel Construction Co., Inc.], Lessor and Lessee will jointly decide which of the subcontractors will be awarded a contract on their phase of the work."

Juengel and all defendants met several times in the spring and summer of 1976. They agreed that Juengel would solicit subcontractor bids upon receipt of architectural plans from Hastings & Chivetta. Juengel prepared a list of subcontractors to be invited to submit bids and circulated the list for the approval of the other parties, allowing them to add or delete names of subcontractors. Juengel also initiated the demolition of the area to be renovated, which was one of its contractual duties.

By the end of the summer, Hastings & Chivetta completed the project's plans and forwarded them to Juengel, which in turn invited subcontractor bids. After Juengel had received, compiled and tabulated the bids, the parties met in late September to review them. The total projected cost of the job was $759,442.00, to which was added the general contractor's fee—described as overhead and profit—of 6% of cost, or approximately $45,567.00, resulting in a total price of $805,009.00.[1] National objected at the meeting that the overall price was too high, but individual subcontractor bids were not discussed.

Shortly after this encounter, National informed the Grassos of its intent to have the project rebid. When the Grassos protested that they had a contract with Juengel, National assured them that it would indemnify if Juengel sued, a fact denied by National.

---

1. Juengel contends that the complete compilation of the bids, rather than the single bid breakdown, should have been used to compute total projected cost. Under the former method the projected cost totalled $755,429.00, plus 6% or $45,325.74 for overhead and profit, for a total contract price of $800,754.74. The difference in results is immaterial.

Mr. Grasso notified Juengel of National's intent to rebid the project and sought a meeting of the parties to resolve differences, but National refused to meet. National proceeded to invite bids for general contractor and subcontractor positions. Bids from the lowest successful bidders amount to a total projected price of $712,388.00, with the job ultimately costing approximately $795,000.00.

For their first point of error defendants Mt. Etna and the Grasso Brothers contend that their contract with Juengel was unenforceable because a condition precedent to their duty to perform—joint agreement on subcontractors by Juengel, the Grassos and National—had not been fulfilled. The Grassos maintain that they in good faith attempted to secure satisfaction of the condition and that failure of the condition was due to the noncooperation of National, a third party which was beyond the control of the parties to the contract.

▮ A condition precedent is an act or event that must be performed or occur, after the contract has been formed, before the contract becomes effective. *Globe American Corp. v. Miller Hatcheries, Inc.*, 110 S.W.2d 393, 396 (Mo.App.1937). Conditions precedent are disfavored, and contract provisions are construed as such only if unambiguous language so requires or they arise by necessary implication. *Kansas City Southern Railway Co. v. St. Louis-San Francisco Railway Co.*, 509 S.W.2d 457, 460 (Mo.1974); *Miran Investment Co. v. Medical West Building Corp.*, 414 S.W.2d 297, 304 (Mo.1967); *Servco Equipment Co. v. C. M. Lingle Co.*, 487 S.W.2d 869, 871 (Mo.App. 1972).

▮ The requirement in a contract of a third party's acquiescence or the performance of some act by him may or may not be a condition precedent to enforcement of the contract. On the one hand, if the fulfillment of the contract depends on the act or consent of a third party, the contract is unenforceable until the third party so acts or consents. However, if a party to a contract unconditionally undertakes to perform an act that is not impossible, but merely requires a third party to acquiesce or perform a preceding act, the party's performance is not deemed to be conditional on the third party's acquiescence or performance. 17A C.J.S. *Contracts* § 456(f) (1963). In the latter situation, inability to secure the necessary permission or acts of the third party does not excuse performance of the contract. *Hensler v. City of Los Angeles*, 124 Cal.App.2d 71, 83, 268 P.2d 12, 21 (1954); *St. Paul Dredging Co. v. State*, 259 Minn. 398, 407, 107 N.W.2d 717, 723–24 (1961); *Barcroft Woods, Inc. v. Francis*, 201 Va. 405, 409, 111 S.E.2d 512, 516 (1959); 18 S. Williston, A Treatise on the Law of Contracts § 1932 (3d ed. 1978); Annot., 84 A.L. R.2d 12, 108 (1962).

▮ While recognizing that the dividing edge between these two categories of contracts is not sharp and some imbrication appears, we find that the contract between Juengel and Mt. Etna falls within the latter category. The conduct of the parties indicates that they deemed the contract to be effective, with Juengel commencing its performance of the contract—attending meetings, soliciting and compiling bids, initiating demolition—and Mt. Etna clearly regarding Juengel as its general contractor. If the parties intended the contract or further performance of it to be conditional on National's consent to subcontractors, they could have explicitly so provided. *See, e. g., New Haven Tile and Floor Covering Co. v. Roman*, 137 Conn. 462, 78 A.2d 336 (1951) (where builder and homeowner stipulated that before they could establish any agreement, approval of third party who was to pay for the repairs must be obtained; there was no contract unless and until third party granted approval); *Benes v. Hickox Building Co.*, 112 N.E.2d 553 (Ohio App.1952) (where contract between building contractor and owner specified that contractor could begin work on building's foundation and could begin balance of construction upon approval of contract by third party who was building's tenant; such approval was essential to further enforcement of the contract). In view of the ambiguous language of the Juengel-Mt. Etna contract,

and the law's general distaste for conditions precedent, we decline to imply a condition precedent to performance of the contract and find no trial court error in this respect. Joint agreement on subcontractors by Juengel, Mt. Etna and National "was merely an act to be performed in fulfillment of the ultimate contract objective"—renovation of the Grasso Plaza National Store. *Cohen v. Crumpacker*, 586 S.W.2d 370, 375 (Mo.App. 1979).

We note that even if the parties had explicitly made performance of the contract conditional on National's concurrence as to subcontractors, National's apparent unwillingness to cooperate with the parties in this regard, as evidenced by its abrupt and inflexible decision to submit the job for rebidding, indicates a disturbing lack of good faith. Where parties to a contract clearly make their performance conditional on the determination of a question or act by a third party, the third party cannot make its determination in an arbitrary and capricious manner or in bad faith, unless the contract expressly grants it such power. *Norman v. McLelland*, 354 S.W.2d 906, 910–11 (Mo.App.1962).

Mt. Etna and the Grasso Brothers next allege that the trial court erred in awarding judgment for Juengel on the ground that joint agreement on subcontractors was a condition precedent to contract formation since such agreement was necessary to determine contract price, a material term of the contract. We find no merit in this contention. Our conclusion that the contractual provision for joint selection of subcontractors was not a condition precedent leads us to this finding. Further, we find no violation of the general rule that a contract must include a definite price to be binding. *Law v. Taylor*, 330 S.W.2d 170, 174 (Mo.App.1959). The cost-plus contract concept, in which the contract price is the contractor's estimated cost plus 6% of cost

for his overhead and profit, is legitimate. *See J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 267 (Mo. banc 1973); *Romine v. Rex Darnall, Inc.*, 541 S.W.2d 50, 52 (Mo.App.1976); *Kalen v. Steele*, 341 S.W.2d 343, 346–47 (Mo.App. 1960). Juengel's projected cost of $759,-442.00, plus 6% or $45,567.00 results in a contract price of $805,009.00.

In their final point of error Mt. Etna and the Grassos contend that if there was a breach of contract, the proper measure of damages is Juengel's lost profits. They allege that Juengel failed to prove damages with the required degree of certainty since it could not distinguish between profit and overhead.

A contractor's proper measure of damages when an owner breaches a construction contract by preventing the contractor from performing the work is contract price, less the amount it would have cost the contractor to perform the contract. *Ark Construction Co. v. City of Florissant*, 558 S.W.2d 418, 423 (Mo.App.1977); *Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 516 (Mo.App.1976); *Sides v. Contemporary Homes, Inc.*, 311 S.W.2d 117, 120 (Mo.App. 1958). This amount, which constitutes lost profits, must be shown with reasonable certainty by proof of facts from which anticipated profits can rationally be estimated. *Artcraft Cabinet, Inc. v. Watajo, Inc.*, 540 S.W.2d 918, 924 (Mo.App.1976); *Mills v. Murray*, 472 S.W.2d 6, 16 (Mo.App.1971).

We find that Juengel's proof of its lost profits was sufficiently certain to allow their recovery. In its cost-plus contract with Mt. Etna, Juengel's profit was to equal 6% of cost. By totaling the low subcontractor bids, Juengel rationally estimated cost to equal $759,442.00, 6% of which is $45,-566.52. The latter amount is clearly Juengel's lost profits.[2]

---

**2.** The same result obviously can be reached indirectly. The total contract price equals the sum of $759,442.00 plus $45,566.52, or $805,-008.52. Subtracting from this the cost saved by Juengel's nonperformance of the contract,

or $759,442.00, results in damages to Juengel of $45,566.52.

Juengel had earlier received payment of $523.00 of its "overhead and profit" charge, allocable to the demolition work it performed. Reducing the $45,566.52 lost profits by this

Mt. Etna correctly observes that the 6% of cost figure not only represents Juengel's anticipated profits but also is designed to cover "overhead and profit." Juengel's inability to differentiate between overhead and profit, however, does not automatically preclude it from recovering the total amount, as contended by Mt. Etna.

There is a divergence of authority regarding the treatment of overhead expenses allocable to unperformed work in determining the amount of lost profits recoverable. *See* Annot., 3 A.L.R.3d 689 (1965). Some decisions include overhead expenses in the plaintiff's total cost saved by nonperformance, deducting them from the contract price. This is permissible only where defendant proves that such expenses were actually saved by the breach—a burden of proof that often cannot be satisfied, as overhead expenses are usually constant, unaffected by the breach of a particular contract. *Matter of Community Medical Center*, 623 F.2d 864, 866 (3d Cir. 1980); *Huffman Towing, Inc. v. Mainstream Shipyard & Supply, Inc.*, 388 F.Supp. 1362, 1371 (N.D.Miss.1975); *Covington Brothers v. Valley Plastering, Inc.*, 566 P.2d 814, 817–18 (Nev.1977); *Houston Chronicle Publishing Co. v. McNair Truck Lease, Inc.*, 519 S.W.2d 924, 932 (Tex.Civ.App.1975). In the absence of proof that the plaintiff saved overhead expenses as a result of defendant's breach of contract, these expenses are included in the lost profits damages award. The rationale supporting this conclusion is that if the contract had not been breached, fixed business expenses would have been paid from profits remaining after payment of costs directly related to performance of the contract. *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 719–20 (3d Cir.

1971); *Coast Industries, Inc. v. Noonan*, 4 Conn.Cir. 333, 231 A.2d 663, 665 (1966); *Jensen v. Manthe*, 168 Neb. 361, 365, 95 N.W.2d 699, 703 (1959). Because Mt. Etna failed to establish that overhead expenses were saved as a result of the breach and the amount of the savings, we find no error in allowing Juengel to recover 6% of costs as "overhead and profit."

Defendants National and Hastings & Chivetta contend that the judgment against them, based on tortious interference with contract, was erroneous on the ground that they were justified in their actions. National's alleged justification is that its conduct was designed merely to protect its legitimate financial interest in minimizing the construction costs.

■ To establish tortious interference with contract—a currently popular cause of action—the plaintiff must prove five elements: (1) a contract existed; (2) defendant had knowledge of the contract; (3) defendant caused or induced breach of the contract; (4) there was no legal justification for defendant's acts; and (5) plaintiff was thereby damaged. *Smith v. Standard Oil, Division of Amoco Oil Co.*, 567 S.W.2d 412, 417 (Mo.App.1978); *Pillow v. General American Life Insurance Co.*, 564 S.W.2d 276, 280 (Mo.App.1978). Proof of the fourth element is contested here,[3] with the burden on the plaintiff to prove the absence of a justification for defendant's interference. *C & M Developers, Inc. v. Berbiglia*, 585 S.W.2d 176, 184 (Mo.App.1979). And, indeed, we believe that burden to have been met.

■ One recognized justification for prevention of the performance of a contract

amount gives damages equal to $45,043.52. Using Juengel's proposed figures (*see* note 1, *supra*), Juengel's lost profits equaled $45,325.74 less $523.00, or $44,802.74. We note that the trial court's award of $44,770.78 damages against Mt. Etna and Grasso Brothers matches neither result. Juengel did not contest the amount of damages on appeal, however, so we need not disturb the trial court judgment.

**3.** The parties tangentially dispute National's knowledge of the contract, with National con-

tending it was unaware of the existence of the *written* contract until late summer, 1976. Such testimony certainly does not disprove National's knowledge of the contract when it instigated rebidding in late September, 1976. Through the facts and circumstances of this case, including the long course of dealing between National and Juengel, with Juengel in the role of general contractor, National's awareness of the contract has been sufficiently proved.

arises when the contract threatens a present, existing economic interest, such as a pecuniary interest in the activities of the party who is induced to breach the contract with another. *Pillow v. General American Life Insurance Co.*, 564 S.W.2d at 282. National had a financial interest in the contract between Juengel and Mt. Etna in that it was obligated to pay for construction costs in excess of $500,000. We find, however, that the contract did not threaten National's pecuniary interests nor justify National's interference with the contract to protect them. National's immediate reaction to Juengel's bid compilation, presented in late September, 1976, was that it was too high. Promptly directing Hastings & Chivetta to invite new bids, National refused further negotiations with Juengel or Mt. Etna.[4] Its efforts were directed toward undermining relations with the parties, rather than furthering them. Had National cooperated with the parties, Juengel might have been able to obtain lower, more satisfactory bids, and the contract could have been preserved. Nor was it more than mere conjecture on National's part that it could receive lower bids. Inasmuch as the right to perform a contract and receive performance in return is entitled to protection as a property right, National's arbitrary and whimsical interference in this instance, based on mere speculation, cannot be justified. *Downey v. United Weather Proofing, Inc.*, 363 Mo. 852, 858, 253 S.W.2d 976, 980 (1953).

National relies on *Zoby v. American Fidelity Co.*, 242 F.2d 76 (4th Cir. 1957), a case allowing interference with a prospective construction contract based on a privileged financial interest motive. The case *sub judice* is distinguishable from *Zoby* in two key respects. First, National induced breach of an existing, partially performed contract, which is entitled to greater protection than a mere expectancy of entering a contract. *Downey v. United Weather Proofing, Inc.*, 363 Mo. at 858, 253 S.W.2d at 980. Second, National induced the breach upon conjecture that it could benefit financially, whereas the defendant in *Zoby* acted upon concrete figures reflecting a substantial monetary difference between two offers.[5] Juengel has thereby met its burden of proving the interference to be unjustified.

Judgment affirmed.

WEIER and REINHARD, JJ., concur.

---

4. A September 7, 1976 letter from National to Hastings & Chivetta indicates that National may have ordered Hastings & Chivetta to resolicit bids even before receiving Juengel's bids. In this letter National admonishes Hastings & Chivetta that "On Grasso Plaza you were to go out for bids. . . . I want you to do what we say and not what the owner of the property or any of his cohorts tell[sic] you."

5. We note that the usual remedy for tortious interference with contract is to hold defendant liable for payments to the injured party of damages resulting from the breach. *Cady v. Hartford Accident & Indemnity Co.*, 439 S.W.2d 483, 485 (Mo.1969). As defendants National and Hastings & Chivetta do not complain of the judgment of punitive damages against them, we need not address the propriety of this award.