**EADES COMMODITIES, CO.,**
Plaintiff–Appellant,

v.

**Terry HOEPER, d/b/a Hoeper Farms,**
Defendant–Respondent.

No. WD 43964.

Missouri Court of Appeals,
Western District.

Feb. 18, 1992.

Byron N. Baker, Kansas City, for appellant.

Larry C. Pace, Kansas City, for respondent.

Before LOWENSTEIN, C.J., Presiding, and SHANGLER and TURNAGE, JJ.

LOWENSTEIN, Judge.

This case involves two separate transactions between the same parties. Plaintiff Eades Commodities ("Eades") contracted to buy corn from Terry Hoeper ("Hoeper"), and brought suit for non-payment of an invoice for losses from undelivered corn. Eades also contracted to buy corn flour from Hoeper, but only picked up a small portion of the corn flour bought, and Hoeper counter-claimed for non-payment of an invoice for losses from the uncollected corn flour. The trial court, sitting without a jury, found in favor of the seller Hoeper on both claims, awarding the buyer Eades nothing, and awarding Hoeper $1,707.60 on his counter-claim. Eades appeals, arguing eight separate points, focusing on inappropriate rulings under supposedly applicable trade rules, and upon the sufficiency of the evidence. The court apologizes for what appears to be an incredibly complex case arising out of a relatively straight-forward series of contracts for sale of grain; the parties have done little to present a coherent theory to either count involved.

*The Facts as Found by the Trial Court*

In this court tried case, the facts must be accepted by the appellate court, under the standard of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), unless not supported by substantial evidence. This court upholds the factual findings of the trial court in this contract case, therefore implicitly denying Eades' points on appeal involving sufficiency of evidence to support the factual findings.

**The corn contract.** Eades, a commodities broker, and Hoeper, a supplier, executed a series of four corn contracts, in which all corn was to be delivered directly to Eades' buyer, Foxley Feedlot ("Foxley"). The last in the series is the subject of this dispute, and like the others, the simple, half-page form contract included on the back a notation that the Grain Trade Rules of the Grain and Feed Dealers National Association would apply. The contract also called for all changes in writing. Eades executed a similar contract with Foxley on the same day of the Eades–Hoeper contract, April 11, 1988. The contract called for April delivery of the 10,000 bushels of corn, as Hoeper had the corn available at that time. Hoeper in fact made deliveries throughout the end of April and early May, all of which were credited to the third and earlier corn contract. Hoeper's last and final delivery of corn to Foxley occurred, although the parties did not yet know this, on May 10, 1988. This May 10 delivery was the first and last credited to the April 11 corn contract in dispute. The evidence reflected that prior to May 10, and in the contemplated time period of April, Hoeper had attempted between seven and fifteen deliveries of approximately 1,000 bushels each, but that Foxley had not accepted delivery, due to limited storage capacity. The evidence also reflected that troubles in delivery to Foxley had occurred prior to this, notably that Hoeper's driver had waited overnight to unload, so that Hoeper's drivers called in advance to set up an unload time. Advance calls were made for the unaccepted deliveries, and Hoeper was forced to send the loads elsewhere. After May 10, Hoeper's corn supply temporarily vanished, for various reasons understood and recognized by Eades and Foxley. Hoeper's assurances that he would deliver the balance of the corn under the April 11 contract led Foxley, and in turn Eades, to informally *extend the contract period* past the end of April, and well into June. However, by July, Foxley no longer felt assured of receiving its corn, and canceled its contract with Eades on July 11, 1988. Eades then canceled its contract with Hoeper on July 16, 1988. Both cancellations were done under the Grain Trade Rules, which allow the non-defaulting party to cancel and receive the difference between contract and fair market price the day following cancellation. As the reader may already

suspect, the corn market had been rising all summer, and Eades sent Hoeper an invoice of $8,332.81, based on the difference between the contract price of $1.8400/bu. and the market price of $2.7325/bu. The trial court denied Eades relief, on the basis that Hoeper had been excused from performance by the attempted tenders in April and early May, which, if accepted, would have fulfilled the contract prior to the hold-up in Hoeper's supply.

**The flour contract.** The second contract at issue was executed between Hoeper and Eades on March 21, 1988, for the sale of 400 tons of corn flour at $49 per ton, with Eades to pick up the flour. However, Eades picked up only 69.3 tons, when his buyer found the flour was inappropriate for his use. Testimony revealed that both Eades and Hoeper then attempted to find alternative buyers for the flour, although Eades was unsuccessful. After Hoeper credited Eades' account for corn flour converted to feed for Hoeper and sold to other buyers, he donated the remaining tons under the contract to a charity, Worldwide Feed the Children. When Eades canceled the corn contract, Hoeper in turn canceled the flour contract by mailgram, invoicing Eades for $9,007.28. The trial court awarded Hoeper the $9 difference in contract price and sale price on 161.4 tons, plus $255 for storage, and denied recovery for any corn flour donated to Feed the Children. Hoeper's total award was then $1,707.60 on the corn flour contract. The Feed Trade Rules applied to this contract through the same form contract language as in the corn contract.

### Eades' Points on Appeal

■ **The corn contract.** In Eades' main argument concerning the corn contract, he points to the Grain Trade Rules as the solution and salvation of his case, yet without any specific or coherent explanation as to how or why these rules are relevant to the case, or how they affect the ultimate decision. This court, therefore, is left with the task of looking at the rules, and decides that as the facts of this case stand, the Grain Trade Rules were correctly found either not to apply here or not to

mandate a result in favor of Eades. Eades argues that the Rules required Hoeper to notify Eades of the "breach" by nonacceptance of deliveries by Foxley, and required Hoeper to present "clear and cogent proof" of nonacceptance of each delivery alleged. Nowhere in any of the Rules offered in evidence do the notification requirements seem to apply precisely to the facts at hand, nowhere is a standard of proof required, and nowhere are any cases cited by Eades to aid the court in applying the Rules in any logical fashion. Further, this court recognizes that continual verbal communication occurred during the relevant time period, that Eades acknowledged that it routinely ignored portions of the Rules, and that Eades' novel approach seems to be "I can't be in breach *now* because no one ever said I was *then*." The point is denied.

■ Eades also argues that the trial court's ruling excusing Hoeper's performance due to unaccepted tenders is against the weight of the evidence. While this court is unclear as to whether Eades takes issue with the factual finding of non-acceptance or with the legal conclusion of excuse of performance, the point is still denied. First, the trial court believed Hoeper and his drivers' testimony that Foxley had not accepted a certain number of deliveries, while Eades' admitted to knowledge of delivery difficulties. This court will rely upon the trial court's superior fact-finding capacity. It makes no difference that the unaccepted deliveries occurred prior to Hoeper's supply dry-up, because both parties testified that Hoeper requested April delivery because that was when the corn was available. The evidence reflected that Foxley was to blame for Hoeper's not being able to finish his contract within the originally requested delivery time. Second, Eades apparently disagrees that non-acceptance of deliveries excuses Hoeper's performance, yet this is entirely fallacious reasoning on Eades' part, with neither cases cited in support of its position, nor consideration of cases cited by its opponent. As Hoeper points out, one excuse for non-performance by a contracting party is based on third party acts. In *Juengel*

*Construction Company, Inc. v. Mt. Etna, Inc.*, 622 S.W.2d 510, 513 (Mo.App.1981), the court noted that if the "fulfillment of the contract depends on the act or consent of a third party, the contract is unenforceable until the third party so acts or consents." In this case, it was impossible for Hoeper to perform, i.e. deliver the corn that Eades had bought, without Foxley allowing Hoeper to unload. That Eades had knowledge of non-acceptance is supported by the record, and that Eades should bear the risk of its own third party buyer's non-acceptance is fair and supported by *Juengel.*

■ Eades' final point regarding delivery under the corn contract is that Hoeper did not present evidence that the unaccepted deliveries were at "reasonable hours," as required by the Uniform Commercial Code, § 400.2–503, RSMo 1986, because no evidence of a specific time was presented. However, Hoeper and his drivers testified that they called in advance for a delivery time, which was denied them. Apparently Foxley is open for deliveries from 3:00 a.m. to 3:00 p.m.; this court finds no testimony in the record to indicate that the drivers attempted deliveries outside these flexible hours, and the point is denied.

■ **The flour contract.** Eades argues that Hoeper failed to follow the resale requirements of the Uniform Commercial Code, § 2–706, § 400.2–706, RSMo 1986, requiring notice of resale at a private sale. Missouri has held the notice requirements must be strictly complied with in order for the seller to receive damages, *Anheuser v. Oswald Refractories Company, Inc.*, 541 S.W.2d 706, 711 (Mo.App.1976), and that the seller has the burden of proof. However, in this case, Eades has given this court no reasons in the page devoted to the point to reverse the trial court's ruling. In fact, Eades was well aware of Hoeper's efforts to resell the flour, and had specifically agreed to just such a course. This court notes the case of *Gray v. West*, 608 S.W.2d 771, 780 (Tex.Civ.App.1980), a Texas case involving resale of hay, where the court noted that the buyer told the seller "you better sell it if you get the chance."

The *Gray* court held the buyer to have sufficient notice of resale, under the U.C.C. § 2–706, *id.* at 780. Also, in *McMillan v. Meuser Material & Equip. Co.*, 260 Ark. 422, 541 S.W.2d 911, 914 (1976), the Arkansas Supreme Court held that knowledge of seller's attempts to resell constituted reasonable notification of a private sale under the U.C.C. § 2–706. In this case, given the parties phone contact, mutual agreement and attempts to "move" the flour, Eades' knowledge of the potential resales, and Eades' continuing access to the flour if Eades had wanted to purchase at contract price, this court will not reverse. The point is denied.

■ Also, Eades again argues that trade rules apply, and mandate a result in his favor because Hoeper did not give written notice of a breach; again, this is not a persuasive argument. Eades states that under the Feed Trade Rules, Hoeper was to follow his July 16 "cancellation" with notice of Hoeper's choice of remedy (i.e. resale) under the Rules. The record, however, reflects that *Eades* contacted Hoeper in early April, and told Hoeper the remaining corn flour would not be picked up, shortly after the flour was found to be inappropriate by Eades' buyer. Even without a determination that Eades was in fact in breach in early April, the reasoning discussed above under the U.C.C. requirements of notice of resale is applicable. Given the communications between the seller and buyer regarding resale, this court concludes that Eades had reasonable notice of Hoeper's intention to elect that remedy under the Feed Trade Rules. Eades and Hoeper discussed the situation over the phone, agreeing that both parties would attempt to find alternate buyers for the flour, and under these facts, Hoeper was justified in reselling the flour. Additionally, this court was not cited any authority in Eades' favor, and the point is denied.

■ Eades' last two points concerning the flour contract are disposed of by this court's acceptance of the trial court's findings of fact. Eades argues that there was no evidence of resale after the date of breach, which occurred, according to

**38**

Eades, on July 16 when Hoeper canceled per mailgram. Therefore, Eades argues that the trial court, in determining damages, could not set the market price for flour based on the resales occurring before the "breach," *Berger Mfg. Co. v. Phillips Hotel Operating Co.,* 89 S.W.2d 703, 705 (Mo.App.1935). However, under the Feed Trade Rules that Eades is fond of quoting, in particular Rule 14(2), and under the applicable U.C.C. provision § 2–706(1), the seller who resells goods has damages based upon the difference between the contract price and the *resale* price. No mention of market price is found in either provision, and Eades appears to be confusing the seller's remedy of resale with the buyer's remedy of "cover," U.C.C. § 2–713, or perhaps with the seller's remedy when simply retaining unaccepted goods, U.C.C. § 2–708 and Feed Trade Rule 14(3). Both these latter remedies are irrelevant here, as is market price, and the trial court's finding of a resale price of $40/ton is accepted as a base for damages, and the point is denied.

█ Likewise, Eades' final point is denied. Eades argues that the trial court's ruling that Eades' failed to complete the flour contract is against the weight of the evidence. There is ample evidence supporting the trial court's ruling: Eades had wanted to make sure the corn flour was available at the contract price, no stipulations as to the corn flour "working out" with Eades' buyer appeared on the contract, Eades contracted to purchase 400 tons of corn flour, Eades did not pick up the bulk of the corn flour, and Hoeper did not let Eades out of the contract by agreeing to look for alternate buyers. Given Eades' failure to complete the contract, the trial court correctly awarded $1,707.60 to Hoeper for contract losses and storage costs. The point is denied.