Kae STUART, f/k/a Kae Sandifer Chamberlain, Appellant,

v.

Bobbie BAYLESS, Bayless & Stokes, and Burta Rhoads Raborn, Appellees.

No. 01–93–00235–CV.

Court of Appeals of Texas, Houston, (1st Dist.).

Nov. 27, 1996.

---

Charles R. Dunn, Christoper C. Pappas, Steven D. Strickland, SaraJane Milligan, James D. Smith, Houston, Andy G. Navarro, Tyler, for Appellant.

Julius Glickman, Eddie M. Krenek, Bobbie G. Bayless, Houston, for Appellees.

Before SCHNEIDER, C.J., and ANDELL and HEDGES, JJ.

## OPINION ON MOTIONS
## FOR REHEARING

HEDGES, Justice.

We grant appellant's motion for rehearing, and we grant the appellees' motion for rehearing directed only at the disposition of their cross-point of error one on original submission. We withdraw our January 29, 1996, opinion, and substitute the following opinion in its place.

The judgment about which appellant Kae Stuart ("Stuart") complains arose out of her attorney-client relationship with Berta Rhodes Raborn ("Raborn"), Bobbie Bayless ("Bayless"), and the law firm of Bayless & Stokes ("B & S"). In 23 points of error on rehearing, Stuart challenges the judgment on various grounds.

Raborn and Bayless represented Stuart in a divorce proceeding and in two subsequent cases arising partly out of that divorce. Ultimately, Bayless, B & S, and Raborn ("plaintiffs") sued Stuart to recover their due and unpaid fees and expenses and asserted causes of action for breach of contract, quantum meruit, fraud, and defamation. Stuart counterclaimed for breach of contract, breach of fiduciary duty, breach of duty of good faith and fair dealing, and breach of duty of loyalty; she also requested the imposition of sanctions against the plaintiffs under Tex.R. Civ. P. 13. The jury found that Stuart had breached her contracts with the plaintiffs and had committed fraud against them. It answered Stuart's counterclaim issues negatively. On Stuart's motion, the trial court disregarded jury findings that plaintiffs recover $339,002 in attorney's fees for B & S's and Raborn's preparation in this case and entered judgment against Stuart for $3,093,085. Stuart raises complaints concerning the fraud findings and the awards of actual and punitive damages and attorneys' fees; several evidentiary rulings; and an order that

allowed plaintiffs to withdraw funds from the registry of the court. In two cross-points, plaintiffs assert that the trial court erred in disregarding certain jury findings and in refusing to submit to the jury plaintiffs' issues concerning conversion, breach of fiduciary duty, and conspiracy. We affirm in part and reverse and render in part.

## FACTS

### Divorce Proceeding

In February 1984, Stuart filed for divorce from Charles Chamberlain. When she decided to change counsel in July 1987, she approached Raborn. They entered into a written agreement based on an hourly fee. By Stuart's own account, Raborn "turned the divorce case around" and obtained cash, property, and a $311,000 judgment for Stuart.[1] Of that amount, $19,000 was an award of attorneys' fees in Stuart's name for Raborn's benefit.

### Bayless Representation

Raborn referred Stuart to Bayless when shortly after that judgment, Stuart learned that Chamberlain was preparing to file bankruptcy. Stuart and Bayless agreed in writing that Bayless would represent Stuart (a) in the collection of the divorce judgment from Chamberlain, and (b) in a suit against Chamberlain's divorce lawyer for breach of trust.[2] In the collection suit, their agreement called for an hourly fee arrangement, while their agreement in the breach of trust lawsuit called for a contingent fee. Both agreements called for Stuart to pay certain litigation expenses in response to monthly invoices from Bayless, due upon receipt.

### Chamberlain's Bankruptcy

As expected, Chamberlain filed bankruptcy. In early 1991, Stuart and Chamberlain reached an "agreement in principle" to settle her claims against him in that proceeding. In June 1992, Stuart received approximately $278,000 from the Chamberlain bankruptcy

---

1. Raborn also represented Stuart in Chamberlain's appeal, and ultimately secured a dismissal of the appeal, in 1990.

2. That suit was based on the attorney's alleged post-divorce-verdict payment to Chamberlain (and himself for attorneys fees) of funds he had held in trust for the benefit of both Stuart and Chamberlain during the divorce proceeding.

settlement. Because of Bayless' pending suit for attorneys' fees, Stuart did not pay Bayless' bankruptcy fees from the settlement proceeds.

## Breach of Trust Suit

Before the bankruptcy settlement was reduced to writing, the breach of trust trial began in the 11th District Court of Harris County. The defendant in that proceeding made several settlement proposals during the trial. Although Stuart was reluctant to settle, she ultimately did settle at Bayless' urging—but only after Bayless acceded to a new arrangement.[3] The court rendered judgment in accordance with the settlement read into the record on April 8, 1991, which called for the defendant to pay Stuart $450,-000 plus "taxable court costs." Within a week, Bayless received a check from the defendant's insurance carrier, made payable to both Stuart and B & S, to hold in trust pending the execution of formal settlement documents.

## Fee Dispute

A fee dispute arose on April 21, 1991, when Bayless called Stuart to discuss Stuart's coming to Houston the next day to endorse the settlement check. When she informed Stuart of the specific amount she was requesting for litigation expenses to be reimbursed from the settlement proceeds, Stuart insisted that the breach of trust defendant be made to pay those expenses. Stuart also protested Bayless' declared intention to pay unpaid legal fees to her and to Raborn from the breach of trust settlement proceeds. The parties forcefully disagreed about the amount of money due Bayless from the settlement proceeds as reimbursed expenses. The conversation deteriorated and abruptly ended. Both women sent follow-up letters stating their respective positions. Stuart replaced Bayless with new counsel in all matters. Bayless, B & S, and Raborn intervened in the breach of trust case for unpaid legal fees and unreimbursed expenses.[4] The breach of trust defendant and/or his insurance carrier paid $450,000 into the court's registry, without prejudice to B & S's right to make a claim against Stuart or the funds. On July 29, 1991, the trial court entered judgment in the breach of trust suit and severed the interventions.

## Suit for Legal Fees and Expenses

Bayless', B & S's, and Raborn's claims were consolidated in a single action in the 190th District Court of Harris County, and Stuart counterclaimed against Bayless, B & S, and Raborn. The suit was tried in October 1992.[5] Immediately after the verdict, B & S, Bayless, and Raborn filed a motion to withdraw the remaining funds from the district court's registry, which the court granted three weeks later. On December 1, 1992, the court amended that order, principally to delete provisions requiring that a bond be posted before withdrawal. On that date, the court also signed the judgment complained of on appeal.

## FRAUD

In points of error one, two, four, and five, Stuart contends that the awards of punitive damages were erroneous because there is no evidence, or alternatively, insufficient evidence, to support the jury's finding that Stuart had committed fraud that was a proximate cause of damage to B & S, to Bayless, and to Raborn. In point of error six, Stuart

---

3. The new arrangement called for Bayless to cap her then-outstanding fees and expenses in the bankruptcy matter and to allow Stuart to pay those fees and expenses from the anticipated bankruptcy settlement or other sources besides the breach of trust settlement. These new conditions were partially memorialized in a handwritten note, which said, "I'll take $450,000.00 now. Bankruptcy fee is final at current bill—Bobbie to finish case at that current amt.—that pd. out of the $2500.00 mo. amts from Charley at 50% to Bobbie and 50% to Kae or from Charlie's lawsuit whichever comes first." In the left margin was the notation "not more than $56,000.00," apparently referring to the amount for which Bayless would finish the case. The note was signed at the bottom by Stuart, Bayless, and Bayless's partner, Dalia Stokes.

4. The breach of trust lawsuit, although settled, had not yet been dismissed.

5. In the meantime, Stuart had received the proceeds from the Chamberlain bankruptcy settlement—approximately $278,000—in June 1992. Because Bayless had already sued Stuart to collect fees, and because the entire breach of trust settlement was in the court's registry, Stuart did not pay Bayless's bankruptcy fees from the proceeds.

contends that the awards of punitive damages were erroneous because at least one of the two fraud theories plaintiffs asserted is "legally, factually, or procedurally defective." Our analysis of this point persuades us that the argument is actually one of legal insufficiency—that the fraud instruction should not have been submitted to the jury because there was no evidence to support it. In point of error three, Stuart contends that, because as a matter of law, she owed no duty other than a contractual duty to pay fees and expenses to plaintiffs, the awards of punitive damages were erroneous. We interpret this contention as a legal sufficiency challenge as well.

### Fraud Finding

Question 17 asked the jury whether Stuart had committed fraud that was a proximate cause of damage to B & S and Bayless, and to Raborn. A definitional instruction accompanied the question:

Fraud occurs when:

a. a party makes a material misrepresentation;

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;

c. the representation is made with the intention that it should be acted on by the other party; and

d. the other party acts in reliance on the misrepresentation and thereby suffers injury.

*or*

a. a party promises to perform an act in the future;

b. the party knew the promise to be false at the time it was made; and

c. the party made the promise with no intent of performing.

### Standard of Review

In a no evidence point, we are to consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and must disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is any

evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988). On a factual sufficiency challenge, we are to consider and weigh all of the evidence, *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex. 1986), and are to set aside a finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We may not substitute our opinion for that of the trier of fact. *Glockzin v. Rhea,* 760 S.W.2d 665, 666 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

■■■ A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986). While a party's intent is determined at the time the party made the promise, it may be inferred from the party's acts occurring after the making of the promise. *Id.* Failure to perform, standing alone, is no evidence of intent on the promisor's part, at the time of making the promise, not to perform as promised. *Id.* at 435. However, that fact is a circumstance to be considered with other facts to establish intent. *Id.* Slight circumstantial evidence of fraud, when considered with proof of nonperformance, is sufficient to support a finding of fraudulent intent. *Id.* Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony. *Id.* at 434. As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex. 1992).

### Testimony

Stuart argues that the evidence did not permit the jury to find that she had no intention, at the time she contracted with the plaintiffs, of paying for their services. She reasons that the evidence shows only that,

after contracting with plaintiffs, she later in good faith disputed the amounts plaintiffs said she owed under those contracts.

Bayless testified that Stuart had not paid her for her services. Stuart admitted that she owed Bayless' fees and expenses in the breach of trust case and that she had not paid Bayless for her services in the bankruptcy case. Bayless testified that during the breach of trust trial, Stuart not only did not claim that Raborn's fees were not valid and should not be paid, but admitted—either in her deposition or her live testimony in that proceeding—that Raborn's appellate fees were valid. Raborn testified that during a telephone conversation with Stuart on April 30, 1991, in response to Stuart's request, Raborn gave her the exact figure of the amount Stuart owed her, including fees for the divorce appeal. Stuart told Raborn that she would pay her every penny and that she did not want to dispute that figure.

Bayless testified that when Stuart claimed to be unable to pay a retainer in the bankruptcy matter, Bayless agreed to represent Stuart without a retainer. Shortly after Bayless agreed to represent Stuart, Stuart told her that she would not be able to pay the monthly expense invoices contemplated by their agreements. From May 1988, when the engagement began, through April 1991, when the breach of trust case settled, Stuart repeatedly told Bayless that she had no money and could pay neither Bayless nor Raborn. She stated that when she got money, she would pay them, and that they could trust her for payment. Finally, Bayless testified that Stuart said all along that, if she did not pay Bayless' fees for the Chamberlain bankruptcy earlier, then she would pay them from whatever she recovered on the breach of trust claim. Raborn's testimony was consistent with Bayless'. Throughout Raborn's representation, Stuart (a) told her that she would pay Raborn when she could, (b) asked Raborn to trust her, and (c) said, repeatedly, between June 1987 and March or April of 1991, that she had no money with which to pay Raborn.

Stuart testified that she never told Raborn that she would not pay Raborn's fees. In fact, before Bayless' suit, she never told Bayless that she would not pay Bayless' fees. At one point, Stuart denied that she ever repeatedly told either Bayless or Raborn that she was going to pay the fees she owed once she got some money. Later, however, Stuart partially admitted that she represented that she would pay plaintiffs when she received some money from the suits. Stuart denied, however, ever saying to Bayless or Raborn, "Trust me, I'll pay you when I can."

Bayless testified that through review of Stuart's bank records obtained during discovery, she had found that Stuart had "substantial funds" available from which to pay those fees. The records themselves were admitted, along with summaries showing the balances in Stuart's separate and joint bank accounts during the two-year period ending with the settlement of the breach of trust suit. The summaries showed balances in the five and six figure ranges—from a low of $29,000 to a high of $232,000.

Bayless also related that in the breach of trust case, she and Stuart had hired Iris Robinson as an expert witness. Bayless had told Stuart at the time they hired Robinson that Stuart would have to make arrangements to pay Robinson's fees as they came due, because Robinson would not agree to wait for the conclusion of the litigation. Bayless passed Robinson's invoice along to Stuart, expecting it to be paid. She then learned, on the verge of trial, that Stuart had not paid Robinson. Stuart told Bayless that she had no money to pay Robinson; when Bayless insisted that Robinson be paid before trial, Stuart was able to arrange it readily. Stuart later testified that her husband Ben Stuart had paid Robinson's invoice.

Raborn and Bayless both testified that Stuart received roughly $50,000 from the sale of a residence awarded to her in the divorce judgment. Raborn had understood that the house had been leased; she learned that it had been sold only when Stuart gave her deposition in the breach of trust suit. Stuart testified that she had sold the house in the spring of 1990. She also testified that she did not specifically tell Bayless or Raborn about the sale at the time, but said, "I'm sure we talked about it at some point. They were aware of it, certainly, when we went to trial

on [the breach of trust suit]." She also said that Raborn knew the house was for sale and that she had done nothing to try to hide the sale from either Raborn or Bayless; at one point she leased the house because it had not sold. On cross-examination, Stuart was confronted with her deposition testimony, on November 28, 1989, that that house was "not up for sale," and an earnest money check dated December 3, 1989, for that same house. She explained later, on direct:

> The house was—we had tried to sell it originally, but the time I married Ben Stuart, recognized we weren't going to be able to sell the house. So, we leased it. The people who leased it lived there six or seven months and then they vacated and we were trying to lease it again. It was not for sale. It was for lease. The person who was handling it ... called me one day and said, I have found someone to lease your house; but, better yet, they would really like to buy it. Would you consider selling it? I said certainly, if the price is what we're looking for, I would. Those people gave us a good price, price we were looking for. So, we sold it. I sold it.

Stuart testified about her financial situation in early 1988, preceding her engagement of Bayless. She said:

> I had not had any child support payments made during the last six months prior to the divorce, and I really didn't have enough money. The house was almost in foreclosure. In fact, for six months, the house note had not been paid. I had had to live an incredible way trying to just get groceries and so forth, and I had bills that were mounting, expecting money any day from this thing.

**6.** Stuart was serving as a family court master at the time Bayless first began representing her.

**7.** Bayless later recounted a similar subsequent episode. Bayless testified, without objection, that after she had withdrawn from representing Stuart, she had heard that (a) Stuart had later tried, unsuccessfully, to back out of the bankruptcy settlement, too; (b) the bankruptcy court ordered the settlement on the terms that had been agreed; and (c) Stuart then appealed that order.

She also testified about her financial condition at the time she engaged Bayless. She stated:

> My financial condition was that I was in pretty bad shape financially. I had pulled the house out of the foreclosure problem we had, and I had paid off the debts at the grocery store and all the things I had been worried about, but I still did not have enough income from my job as master [6] to cover my monthly expenses. If I didn't have some other money from another source, I would not be able to stay in that house, and I just couldn't meet the monthly expenses that I had.

Bayless testified about the settlement of the breach of trust suit as follows. After a settlement had been reached, but before it had been read into the record, Stuart asked Bayless to approach their antagonists in that litigation and ask them to pay Stuart's expert witnesses' fees as part of the settlement. Bayless said, "I told her that was crazy; that we already had a deal and they weren't going to pay her expert fees. That was just not going to happen. She said she wanted me to tell them to do that. She wanted me to try, and she was laughing about it like it was a big joke; that she knew she was going back and changing the deal,[ [7] ] but she wanted me to try and, if I could, apply it to my bankruptcy fees." Later, after the settlement had been dictated into the record and the settlement hearing concluded, as Bayless was gathering up the papers they had brought to court, Stuart was talking about how happy she was about the settlement and that she was going to be able to pay her lawyers.[8] Stuart then turned to Bayless and said, "You know the reason I never paid you your bankruptcy fees, don't you? Well, that was because I wanted you to be hungry and work hard." [9] Stuart denied making that statement.

**8.** One of the jurors from that case testified to the same statement by Stuart.

**9.** An excerpt from Stuart's deposition was read for the jury, in which Stuart was asked about that same conversation:

> Question: Ms. Stuart, did you ever tell Bobbie Bayless that the reason she was—that you never paid her anything was so Bobbie would be hungry and would work harder and do a good job?

Bayless further testified that after she received the breach of trust settlement check but before the beginning of the fee dispute, she called Stuart about endorsing the check so that it could be deposited in a trust account. Stuart was reluctant to endorse the check, citing the expense of having one of Bayless' staff fly up from Houston [10] with the check. Stuart then suggested that, "if it was an issue of the check clearing the bank and getting it cleared in the bank, that we could run it through Dresser's account." Bayless refused because she was responsible for disbursing money she held in trust only in accordance with that trust.[11] Bayless testified that after that episode, but before the settlement proceeds were ultimately paid into the court's registry, Stuart tried to get all the settlement proceeds paid directly to herself.

Stuart testified about her justification in not paying Bayless:

(1) The quality of the representation she had received in the breach of trust suit and/or the bankruptcy suit was below Stuart's expectations and/or was otherwise substandard;

(2) Her net recovery in the breach of trust suit was below her expectations and/or was otherwise substandard, because she was overcharged. She reasons that the breach of trust settlement, as she had understood it at the time, was for the defendant there to pay all Stuart's litigation expenses incurred in connection with that suit, not just those qualifying as taxable costs; and in the alternative, that the litigation expenses her attorneys incurred on her behalf were excessive.

Answer: No. That's not the way—that's not what I said.
Question: Well, how do you remember saying it?
Answer: I remember saying something to the effect that it was probably—number one, I never had the ability to pay Bobbie Bayless; so that wouldn't have been the reason; but I remember saying to her that we—that made sense that in—in—one would work harder if one were expecting something out of it that had not yet been paid.

(3) Bayless had withdrawn from her representation of Stuart, without Stuart's consent.

(4) Bayless was going to pay herself and Raborn out of the breach of trust settlement proceeds.

When asked about any statements she had made about Raborn, she said,

I think mostly positive comments about Burta Raborn; that I thought that she had done a really good job in the divorce[.] ... I was aware that every lawyer involved in this thing, no one had crossed all the T's. No one had dotted all the I's, but that would be second. Everybody's going to make some mistake. Burta, to me, had never made a mistake that was of consequence. She had never made a mistake of trying to harm me. She had never made a mistake, I thought, in trying to mislead me in any way, and I probably conveyed those things to Bobbie Bayless, but, you know, no one's perfect.

On cross-examination, Stuart acknowledged that she owed Raborn's attorneys fees for the divorce proceeding. With respect to the portion of those fees related to the divorce appeal, she stated that she had not paid Raborn because she had not received a bill for that amount. She testified that her position on whether she owed Raborn anything had changed since then. When she did get a bill in response to her request, she "had some questions about the amount that I wanted to discuss with Ms. Raborn. There were some things involved in the appeal that once I got the bill that I wanted to talk to her about. That was all. I wanted to discuss the total amount with her."

On cross-examination, plaintiffs' counsel asked Stuart whether it was her position that Bayless was not entitled to a single penny

10. In May 1989, Stuart remarried; her new husband, Ben Stuart, was a senior executive at Dresser Industries. After her remarriage, Stuart had moved to Dallas.

11. As Bayless noted in a later letter to Stuart, breach of that same responsibility by another with respect to other funds was the very nature of the underlying suit that had generated those settlement proceeds.

from the bankruptcy lawsuit or from the contingency fee on the breach of trust suit. Stuart answered that it was up to the jury to decide: she was asking "that if they decide they don't deserve a penny, not to award it or whatever they decide that they pay, they should award that." Later, when the same matter was addressed again on cross-examination, Stuart acknowledged that in her 1991 deposition, she had said that she did not dispute the contingent fee or the expense reimbursements owed to Bayless on the breach of trust suit.

Stuart was asked, "The reason you didn't do it [pay the fees], at least, your stated position is because they didn't demand it; it's not because you didn't have the ability to pay?" and responded, "No, that's not the reason I didn't do it. The reason I didn't do it, as I have said over and over again, was because of the agreement in the beginning as to how and when it was to be done. And unless somebody changed that agreement or told me there was something wrong with that agreement or denied that agreement, that was the agreement as far as I knew."

**Stuart's Intent**

█ It is clear from this record that while Stuart may have been an exceptionally difficult client, there is no evidence that she intended when she entered into the contracts with Bayless and B & S and with Raborn to avoid paying for their services. There is no evidence that at the time Stuart made her promise to pay plaintiffs, she had no intention to pay them and intended to deceive them into believing otherwise. *See Schindler v. Austwell Farmers Cooperative*, 841 S.W.2d 853, 854 (Tex.1992)(per curiam).

Neither of the two theories submitted to the jury was supported by legally and factually sufficient evidence.

We sustain points of error one through six.

## LOST PROFITS

In points of error seven through 12, Stuart attacks the trial court's award of $500,000 for lost profits. In points of error seven through 10, she asserts that both the evidence is legally and factually insufficient to support the jury's finding awarding B & S $500,000

for lost business opportunities. She attacks the existence of the source of the lost business opportunities—contingent fee cases that Bayless and B & S were unable to undertake because of Stuart's actions. She also contends that, as a matter of law, plaintiffs did not establish these damages with the certainty required to support a recovery. In points of error 12 and 11, Stuart asserts that lost contingent fees are, as a matter of law, too speculative to be properly recoverable, and "are not a proper measure of damage under the facts of this case." She contends that it was improper to award B & S *both* the outstanding fees Stuart had not paid, *and* the lost contingent fees, because the two together compensated B & S in excess of the damages it had incurred due to Stuart's conduct.

**Standard of Review**

█ An attorney under a contingency fee contract is permitted to recover on the contract in Texas; the usual rules of contract law apply. *Howell v. Kelly*, 534 S.W.2d 737, 739 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). The attorney may treat a repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he or she would have received if he or she had not been prevented from performing. *Id.* at 740. Recovery for lost income does not require that the loss be susceptible to exact calculation. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983). The amount of the loss need only be shown by competent evidence based upon reasonable certainty. *Id.* Opinions or estimates of loss can be competent evidence to support a recovery for lost income, if based upon objective facts, figures, or data from which the amount of lost income can be ascertained. *Holt Atherton Indus. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992).

█ Stuart concedes that where the evidence warrants such a finding, lost profits is an appropriate measure of damages. Lost contingent fee cases are in the nature of lost business. If a defendant's breach of contract or fraud reduces the volume of the plaintiff's business, but creates no reasonable opportunity for the plaintiff to reduce its general overhead expenses, then the appropriate

measure of damages is the amount of lost revenue, without deduction for a portion of the fixed overhead expenses. *Houston Chronicle Publishing Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 932 (Tex.Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.).

## Testimony

Bayless testified that because her firm was a two-lawyer firm, she and her partner were able to undertake only a limited number of contingent fee cases; they supported them with the hourly work that they did. She testified that Stuart's failure to pay caused cash flow and other problems that prevented the firm from taking additional contingent fee cases beginning in April 1991. She testified that she had turned away contingent fee cases during that time and referred to four in particular. First, there was a case involving problems with a merger between two accounting firms that she handled for a while on an hourly basis; when the client was unable to continue with that fee arrangement, and Bayless could not afford to carry the case on a contingent fee basis, the client sought and found other counsel who could. Bayless testified that she expected the damages in that case to be in the $500,000 to $2 million range, and that her 40 percent of the recovery would have been between $200,000 and $800,000, based on her estimate of the damages. There were also two cases to collect judgments—one for $3 million and another for $300,000. Finally, she declined a probate matter in which $450,000 was in controversy. Her fee in each of those cases would have been 40 percent. Bayless candidly testified that a recovery in a contingent fee matter is "speculative."

On cross-examination, Bayless was asked about "overhead expenses" such as office rent, salaries to employees, payroll taxes, and other fixed costs of doing business. She testified that the fee calculations she had made on direct—multiplying 40 percent by the prospective recovery—did not take overhead expenses into account. She explained that that calculation was appropriate "because we pay our overhead with our hourly cases. Contingent fee cases are all profit to

us." She was also asked who the prospective client had been in the $3 million judgment collection case, and said, "I was contacted by an attorney in Chicago, and I can't remember the company that he represented. I can't—to tell you the truth, I can't even remember his name. I have it in my office, but I don't remember off the top of my head." (Intervening question omitted.) She was asked whether she had made an effort to determine whether the judgment debtor was solvent, and replied, "Well, they [the Chicago firm] had already done some investigation on it and they—in an effort to make—convince me to take the case, they had presented me with some stuff that indicated solvency; but we just weren't taking any contingent fee cases." She testified that she did not, after turning the case away, follow the progress of the collection effort.

On cross-examination about the other judgment collection case and the probate matter, Bayless testified that the $300,000 collection case had been referred to her within the past year, by a local Houston lawyer, Kevin DuBose. She was unable to recall the parties' names but testified that they were local people, and that the judgment had gone to the supreme court and been affirmed there. Concerning the probate matter, she recalled that it was a will contest involving an estate in Fort Bend County; when asked if she remembered who the litigants were, she testified, "No, sir. It was someone from California." She testified that it was the contestant who sought her representation, and that she did some work on the estate to verify assets:

> Well, yes, we verified the amount. We knew the amount at issue was four hundred—$450,000 testamentary trust and some other—in other words, a trust under the will of $450,000 and some other amounts that they felt had been improperly paid; but beyond that, we—we tell people now that we do not take contingent fee cases. So, we don't do any work on a case, if we're not going to take it.

Bayless went on to say that she had not monitored the case after she declined it and didn't know "whether or not a contest was filed," or "whether or not the contestant won

or was going to win." When asked for anything else to help identify the matter, she said that "[t]here was an attorney in Austin at Liddell, Sapp that they had talked with first; but that's the only other information I've got."

On redirect, Bayless testified positively that the judgment debtors in both collection cases were solvent.

■ Fred Hagans, the attorney who took over the accounting firm merger case from Bayless, also testified, both about that case and other matters as follows:

Q: Tell us the nature of the case, just generally, as much as you can, without—

A: Again, [Mr. Miller, the plaintiff] had a very successful practice, based on the very early evaluation; and let me say that we evaluate cases from time to time. It's my belief that this case is worth somewhere in the range of a half a million dollars to as much as $2 million. It could certainly be a great deal more than that, but it's my belief that it would range in that neighborhood because he did have a successful accounting practice before he went in. I think his damages will be substantial. So, that's my belief at this time.

. . . .

Q: ... [W]hat do you think will be the reasonable value and expectancy of an attorney's fee in this case that was—that Bobbie Bayless could not handle?

A: I think a reasonable fee in that case will be somewhere between $150,000 or $200,000 to, perhaps, as much as seven or $800,000.

Q: ... What are the difficulties in trying to handle contingent fee cases?

A: Well, since it is result-oriented, you work for one or two or three or four years, however long; and during that period of time, you generally have, at least, on that case—you have money going out and no money coming in, with respect to that case, as compared to a lawyer who's working, for example, on an hourly rate. He works some on a case during a month. He gets paid for that work. On a contingent fee, you

don't. So, what you do is, when you get to a result and you obtain a fee at the end, ordinarily, that does—overhead, secretaries, office space, all those things. Then, it allows you to have money available, both for profit and to put into or invest into new cases. So, when you don't get that money, it's difficult to invest in new cases or to have the money available so that you can afford to take another contingent fee case and wait another one or two or three or four years for a recovery in that case.

Hagans' testimony on cross-examination indicated that his opinion on a reasonable fee in the accounting firm merger case took into account an evaluation of the likelihood of prevailing at trial:

There is a remote possibility that we could go in the hole in that case and end up with less than we started out with. I think, on the other end, the remote possibility is that this case could also generate a recovery in the ten to $20 million range. What I tried to give earlier was a reasonable probability of the value, based on my experience and my knowledge of that case. On using probability, I think the reasonable probability is between a half million to 2 million.

We believe that this testimony is sufficient to support a jury finding of $500,000 as lost profits.

■ Collateral to her attack on the lost profit finding as speculative, Stuart argues that by awarding B & S both the unpaid legal fees and the "lost contingent fees," B & S was placed in a better position than if Stuart had paid the fees. The basis of her argument is her assertion that Bayless testified that the Stuart case consumed all of her time. Stuart thus concludes that B & S received more from Stuart's breach of her contract with attendant lost profits than it would have from Stuart's performance. We disagree. The record does not support Stuart's premise. Looking to the portion of the statement of facts Stuart cites in support of her assertion about Bayless's testimony, it is clear, in context, that when Bayless said "this case," the Stuart case Bayless was referring to was the fee dispute case *against*

Stuart, not the work she performed *for* Stuart in the breach of trust case and the Chamberlain bankruptcy.[12] Bayless' testimony was that the fee dispute case against Stuart consumed Bayless' time—which, along with the cash flow problem Stuart's failure to pay had created, prevented the firm from taking on additional contingent fee cases since April 1991. Stuart's complaint that B & S was overcompensated is without merit; the evidence was legally and factually sufficient for the jury to conclude that B & S was not overcompensated.

We overrule points of error seven through 12.

### MENTAL ANGUISH

 In points of error 13 and 14, Stuart asserts that the trial court erred in awarding Bayless $100,000 for past mental anguish because the evidence is legally and factually insufficient to support the jury's finding that Stuart's fraud had caused Bayless those damages, and because "mental anguish damages are not recoverable, as a matter of law, under this record." We agree. Mental anguish damages cannot exist without a finding that an independent tort has been committed. *In re Marriage of Moore*, 890 S.W.2d 821, 830 (Tex.App.—Amarillo 1994, no pet.); *see Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex.1993). Because the evidence was legally insufficient to sustain the fraud finding, there is no independent tort on which to append mental anguish damages.

We sustain points of error 13 and 14.

### FUNDS IN COURT'S REGISTRY

 In point of error 15, Stuart contends that the trial court committed reversible er-

**12.** On direct examination, the following exchange took place:

Q: All right, in addition, have you continued to work and prepare on this case, as well?
A: Yes, sir.
Q: *And under your—when you were working on this case, were you available to work on other cases?*
A: *No, sir. Well, No—not at the same time.*
Q: All right. So, you've had to work on this case, in lieu of working on other matters?
A: That's right.
Q: And the amount of money—have you kept your time records on the amount of time you've spent in this case?

ror in excluding evidence about the nature and amount of the funds held in the registry of the court "from which Stuart was always to pay Plaintiffs' fees and expenses." Stuart has not directed us to the location in the record showing the specific ruling or rulings of which she complains. Tex.R.App. P. 74(d). Error, if any, is therefore waived. *Elder v. Bro*, 809 S.W.2d 799, 801 (Tex.App.—Houston [14th Dist.] 1991, writ denied); Tex. R.App. P. 74(f).

We overrule point of error 15.

### PREJUDICIAL EVIDENCE

In point of error 16, Stuart contends that the trial court committed reversible error in admitting evidence concerning her lifestyle and bank accounts because it had no purpose other than to prejudice and inflame the jury.

 To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show both that the trial court's ruling was in error and that the error was calculated to cause and probably did cause rendition of an improper judgment. *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 837 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); Tex.R.App. P. 81(b)(1). Reversible error does not usually occur in connection with rulings on questions of evidence unless the appellant can demonstrate that the whole case turns on the particular evidence that was admitted or excluded. *Texaco v. Pennzoil*, 729 S.W.2d at 837; *Atlantic Mut. Ins. Co. v. Middleman*, 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

A: Yes, sir.
Q: And ... are those time records in evidence on Exhibit No. 21?
A: Yes, sir.
(Emphasis added.) Plaintiff's exhibit 21 consists of a series of monthly compilations of time spent and expenses incurred by B & S "in reference to: Kae Stuart"; the entries begin on May 3, 1991, after the April 21, 1991, phone call in which the fee dispute first arose, and they end on September 24, 1992, shortly before trial of the fee dispute case began.

The record references Stuart has supplied direct us to eight rulings on objections. Seven of those objections were rule 403 objections; the one aberrant ruling is not germane to Stuart's point of error. The trial court sustained two of Stuart's rule 403 objections. The remaining five objections are at issue here:

(1) On the first day of trial, Stuart's counsel objected to the "wholesale admission and offering of all my client's bank records." The trial court overruled the objection and admitted three volumes consisting of deposit slips, cancelled checks, and monthly statements between May 1989 and October 1991 for the Stuarts' joint checking account.

(2) Three weeks later, on the morning of the seventh day of trial, plaintiffs read an excerpt from Stuart's deposition concerning a 1991 bankruptcy court hearing. In response to a question concerning why she had not attended that hearing, Stuart testified that she and Ben Stuart were in Europe on what was a business trip for him and a pleasure trip for her. The trial court sustained her rule 403 objection to the question, "Where all did you go in Europe?" The trial court then overruled her rule 403 objection to the next question, "Have you been out of the country any other times in 1991?" There followed a series of questions about Stuart's vacation trips and other trips in 1991, in which she briefly described a four or five day working vacation trip to Canada; a trip to New Mexico to pick up her child at camp; four or five days on vacation in Eleuthera; and two visits to Colorado—once for a week or two, on business, and once for four or five days, to take her children skiing at spring break.

(3) Later that morning, plaintiffs' counsel asked Stuart two brief series of questions that generated additional rule 403 objections. In the first, he elicited from her that she had paid a plastic surgeon $10,954 in October 1990 to correct a deviated septum she had from a previous automobile accident, and that the outstanding amount of Bayless's reimbursable expenses at that time was $5,527.

(4) In the second, he followed up on the subject of Stuart's trips in 1991.[13] In both instances, Stuart asked for and received a running objection.

(5) The following morning, through Stuart, plaintiffs' counsel introduced the joint tax return she and Ben Stuart had filed for 1990. Stuart asked for and received a running objection to the return and all questioning about it. Plaintiffs' counsel had Stuart read for the jury the $576,814 figure for adjusted gross income, then moved on to another subject.

▆▆▆ Each of these matters had some potential for the prejudicial effect that Stuart argues did in fact accrue—namely, to appeal to the jury to decide the case based on bias against wealthy people. However, the bank records, the deposition questioning about Stuart's trips in 1991, and the live questioning about her plastic surgery and tax return, all had probative value as well in that they tended to establish ability to pay Bayless' and Raborn's legal fees.

Evidence about Stuart's 1991 trips was of questionable relevance; it had little, if any, probative value with respect to Stuart's ability to pay, her intent, or any other fact of consequence to the determination of this action. But we cannot say that its potential

13. In pertinent part, the exchange was as follows:

Q: I won't go back over those trips, but Eleuthera is a French resort area island, isn't it?

. . . .

A: No, sir, I don't think it has to do with anything with France, not to my knowledge.
Q: Well, it's a resort island and area, isn't it?
A: Resort. It's a sparsely inhabited island, yes. It's a resort—well, I don't think it's a resort. I don't think the people there would say that, no.

. . . .

Q: It has a beach?

A: Has a beach, it does.
Q: Where is it?
A: It's in the Bahamas. It's one of the islands in the Bahamas.
Q: Aspen—we have talked a little bit about that—isn't that kind of what's called a playground, one of the great playgrounds for a lot of people?
A: I don't know what it's called. It's a ski area and it's a wonderful place in the Rocky Mountains in the summertime.
Q: Did you go there in the summertime?
A: I went to stay at a friend's house in Snowmass, which is right next to Aspen. So, we speak of it as Aspen.

prejudicial effect on the jury was, on its face, either extreme or pronounced.

Stuart points to no instance, either in their closing argument or otherwise, in which she contends that plaintiffs made any express appeal to the jury to decide the case on any improper basis; nor does she direct our attention to any instance, beyond the mere fact of the improper questioning, in which plaintiffs made such an appeal to the jury obliquely or by implication. We see no basis for concluding that the jury decided the case on an improper basis, or that the trial court abused its discretion in overruling Stuart's rule 403 objections.

We overrule point of error 16.

### ATTORNEY'S FEES

In points of error 17 through 22, Stuart attacks the trial court's award of attorneys' fees to plaintiffs.

In points of error 17 through 19, Stuart complains that the trial court erred in awarding Bayless and B & S $272,101.68 in attorneys' fees they incurred in litigating this fee dispute. In point of error 17, she contends that the award of attorneys' fees was erroneous because the evidence is legally and factually insufficient to support the jury's finding in response to question 13(a), that that amount was a reasonable fee for the necessary services the firm of Glickman & Barnett performed for B & S for preparation and trial of its contract claims against Stuart in the fee dispute case. Stuart contends in point 18 that the amount of the fee award is excessive, and that, as a matter of law, Bayless and B & S are not entitled to that excessive amount. In point 19, Stuart contends that the award is error because Bayless and B & S failed to segregate the time spent on contract claims, for which they may recover attorneys' fees, from the time spent on tort claims, for which they may not recover attorneys' fees. In her points of error 20 through 22, respectively, Stuart assigns the same three errors concerning the $90,935.97 attorneys' fees award to Raborn that she raises in points of error 17 through 19 about the attorneys' fees award to Bayless and B & S.

As a general rule, in a case involving multiple claims, the party seeking attorney's fees carries the burden of proof to present sufficient evidence of a reasonable fee for those services attributable specifically to the claim or claims for which recovery of attorneys' fees is authorized. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex. 1991); *Flint & Assoc. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 624 (Tex. App.—Dallas 1987, writ denied). Services for which reasonable fees may be awarded include services rendered in connection with *all* claims—even if attorneys' fees are not recoverable for some of those claims when brought alone—if: (a) the claims arise from the same transaction, and (b) are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *Stewart Title,* 822 S.W.2d at 11; *Houston Lighting & Power Co. v. Russo Properties, Inc.,* 710 S.W.2d 711, 714 (Tex.App.—Houston [1st Dist.] 1986, no writ).

Stuart asserts that "the record reflects that plaintiffs' counsel spent an inordinate amount of time and effort trying to convert a breach of contract action into tort claims." Yet she omits any record references or recitation of testimony to substantiate her claims. We hold that error is therefore waived.

We overrule points of error 17 through 22.

### Withdrawal of Funds Without Bond

In point of error 23, Stuart contends that the trial court erred in allowing the plaintiffs to withdraw the remainder of the $450,000 from the registry of the court without either requiring plaintiffs to post a bond or otherwise protecting Stuart's rights in the event of a reversal on appeal.

Plaintiffs contend that by agreeing to the withdrawal, Stuart waived any complaint on appeal. In order to preserve a complaint for appellate review, a party must present a timely request, objection, or motion to the trial court, stating the specific grounds for the ruling she desired the court to make. Tex.R.App. P. 52(a). Here, Stuart filed a written opposition to disbursement of the funds in the registry. Later, however, when those funds were discussed at an oral hear-

ing on plaintiffs' motion for entry of judgment, Stuart's counsel indicated assent to the disbursement of the registry funds to plaintiffs so long as the disbursement did not work as a waiver of any potential points on appeal. The disbursement did not constitute a waiver of appellate complaints.

 Funds on deposit in the registry of a trial court are always subject to the control and order of the trial court, and the court enjoys great latitude in dealing with them. *Troutman v. Interstate Promotional Printing*, 717 S.W.2d 428, 430 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). Disbursement orders are reviewed for abuse of discretion. *See id.* Stuart has not shown that the trial court's order complained of here constituted an abuse of discretion. Furthermore, given that we have affirmed a money judgment against Stuart, albeit less than the trial court entered, she does not appear to have demonstrated any harm.

We overrule point of error 23.

## PLAINTIFF'S CROSS–POINTS

Plaintiffs raise two cross-points of error.

### Disregarded Jury Findings

In cross-point of error one, plaintiffs assert that trial court erred when it disregarded specified jury findings that Bayless and B & S were entitled to recover an additional $216,501.85 and that Raborn was entitled to recover an additional $122,500.

 A trial court may disregard a jury finding if and only if the finding is either without any evidence of probative force to support it, or is immaterial—which is to say that, either the question never should have been submitted, or, though the question was properly submitted, other findings operate to deprive the answer of legal significance. *C & R Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966).

Plaintiffs assert that the answers which the trial court disregarded were material and were supported by the evidence. Yet they supply no record references to direct this Court to the evidence that they contend supports the disregarded answers. In addition, they have supplied neither argument nor authority to show that the findings were material. Error, if any, is therefore waived. *Finch v. Finch*, 825 S.W.2d 218, 223–24 (Tex. App.—Houston [1st Dist.] 1992, no writ); Tex.R.App. P. 74(f).

We overrule cross-point of error one.

### Refused Jury Questions

In cross-point of error two, plaintiffs assert that the trial court erred when it refused to submit to the jury plaintiffs' issues concerning conversion, breach of fiduciary duty, and conspiracy.

Plaintiffs provide neither record citations, summation of evidence, nor argument to support their contention that these issues should have been submitted to the jury. Error, if any, is therefore waived.

We overrule cross-point of error two.

We affirm the award of actual damages.

We reverse and render the award of mental anguish damages to Bayless.

We reverse and render the award of punitive damages to Bayless & Stokes.

We reverse and render the award of punitive damages to Burta Rhoads Raborn.

We affirm the award of attorney's fees.

We affirm the award of lost profits.

OLIVER–PARROTT, former C.J., sat on original submission, but did not participate in the consideration of the motions for rehearing.

On a motion for en banc consideration, SCHNEIDER, C.J., and COHEN, HEDGES, ANDELL and TAFT, JJ., voted to deny en banc consideration.

HUTSON–DUNN, O'CONNOR and WILSON, JJ., voted to grant en banc consideration.

O'CONNOR, J., dissents from the denial of en banc consideration.

WILSON, J., joins the dissent from the denial of en banc consideration.

MIRABAL, J., recused herself and did not participate.

O'CONNOR, J., dissenting from opinion on motions for rehearing.

I dissent from the panel's resolution of points of error seven through 12, regarding the recovery of lost contingency fees.

### Lost Contingency Fees

Bayless represented Stuart as her attorney from April 1988 to April 1991, when she withdrew. Bayless sought attorney fees for this period.

Bayless filed suit against Stuart the same month she withdrew as Stuart's lawyer. Bayless sought attorney fees for the lawyer she hired to represent her in the lawsuit against Stuart, the period from April 1991 to September 1992, the date of trial.

Bayless also sought attorney fees in the guise of "lost contingency fees," for the period April 1992 to September 1992. Bayless claims that if she had not been involved in her suit against Stuart, she could have accepted at least four contingency cases.

Bayless was awarded the attorney fees for Bayless' work while representing Stuart ($214,371); attorney fees to pay Bayless' attorney for prosecuting the suit against Stuart ($216,502); and "lost contingent fees" ($500,000), for a total of $930,873. Stuart argues the lost contingency fees are not permitted by law. I agree.

Here is a chart of the three awards of attorney fees.

### ATTORNEY FEE AWARDS TO BAYLESS

| Bayless employed by Stuart as her attorney | Bayless withdrew as Stuart's attorney | Bayless sued Stuart for attorney fees | Trial |

6–88 → Attorney fees for suit on behalf of Stuart $214,371 → 4–91 → Attorney fees for suit against Stuart $216,502 **plus** Lost contingency fees of $500,000 → 9–92

---

In Texas, attorney fees are available only by contract or under a statute that permits attorney fees. *Travelers Indemnity Co. v. Mayfield,* 923 S.W.2d 590, 593 (Tex.1996). No statute permits the recovery of attorney fees for lost contingency fees during the time a lawyer's suit to collect fees is pending.

Even if a lawyer could claim compensation for the time such a suit was pending, the

recovery of "lost contingent fees" is too speculative. Lost contingent fees would be contingent on the favorable resolution of too many factors: that some persons might employ Bayless as an attorney, that such cases would be successfully prosecuted, that the defendants would be solvent, and that the judgments could be collected against them.

I would hold the law does not permit the recovery of lost contingency fees to cover losses during the pendency of a lawyer's suit against a client; and, lost contingency fees are too speculative to be recoverable. Thus, I would sustain points of error seven through 12.

WILSON, J., joins this opinion.